The Judges delivered their opinions.*
Judge Carr.
In 1794, when the rage for speculation in wild lands was at the height, Moore and M’Clung entered into a contract for taking up in partnership 60,000 acres of land, in the county of Greenbrier, on Gauley river, and its waters, along the south side of the river, below Hominy creek. Having made many entries, they had an inclusive survey, made in September, 1794, comprehending 43,417 acres, for which a patent issued to Moore in June, 1795. The general position of the survey was this. Gauley running nearly a west course; the beginning call was near the river on the south side; thence the line ran off in a southerly course for some distance; turning then westerly, it ran off for a great distance with the river, and down it; then turning northerly, it ran to the river, and called (not for the meanders of the river,) but for a straight line, to the beginning. The length of this closing line was 5,060 poles, rather upwards of 15 miles. It was not actually run out at the time of the survey, but left open; a practice said to be common in that quarter. Hughes, the plaintiff, in 1795, entered for 400 acres of land on the north side of Gauley river, opposite to a part of Moore's survey. In 1798, he surveyed, and in 1800, obtained a patent. In 1807, Moore and M’ Clung, for the first time, ran the closing line of their patent. This being a straight line, and the rivers in that mountainous country generally crooked, it was to be expected that it would, in the distance of 15 miles, cross the river several times. Accordingly, we find that it crossed four times; took in a considerable quantity of land on the north side, and among other tracts the 400 acres of the plaintiff. He being in possession, and refusing to yield the land, M’ Clung, (who had bought of Moore) brought *455 ejectment against him, and recovered judgment. This bill was filed to injoin that judgment, and to obtain a deeree for the legal title. The Chancellor decreed in favor of Hughes, and M’Ciung appealed.
This statement shews that the ejectment must have presented a question of title and boundary purely; a question peculiarly proper for a Court of law, and a jury. They have pronounced that the patent of M’Ciung covered the laud; and being the eldest, carried the legal title. Can this question he ro-examined in equity ? We will consider this, first, on general principles; secondly, on the doctrine of caveats.
1. If there were mala fides or fraud of any kind in the transaction, it is clear that equity might interpose, and say to Moore or M’Clung, “though you have gotten the legal title, you shall not enjoy the fruits of your iniquity. Taking hold of your evil conscience, we will postpone you to Hughes, and compel you to release to him your legal title.5-' Does the bill contain any charges sustained by evidence, which would authorise this procedure ?
The first ground of equity is, that Moore and M’Ciung sold the land to Morris and Nicholson, who, in 1794, sent Robert James as their agent, to view it and ascertain the boundaries: that he, with Welch the surveyor, went round the survey, and ran the closing line on the south side of Gauley, declaring he had no claim to land on the north side, Supposing this literally true, it is difficult to perceive how it would attach an equity upon the conscience of Moore ox M’Ciung in favour of Hughes, who had not then even made his entry. But when we find that this James was a mere agent for Morris and Nicholson, whose only business was to view and report the quality of the land; that the contract with Morris and Nicholson was either never executed or afterwards rescinded; and that (as the witness Patterson says) the reason why they did not cross the river in running the lines of the land, was, that it was so high they could not cross, and therefore, they head to go *456 up the south side; surely we must conclude, that there is nothing in this allegation or proof, to authorise equity to compel a release of the legal title.
The next ground of equity is, that Welch the surveyor was a partner with Moore and M’Clung: that he told the plaintiff’s neighbours that they meant to take no land on the north side of the river, and encouraged them to locate those lands: that after Hughes had made his entry, it being suggested to him that the last line of Moore and M’Clung might take in the land, he sent to Welch for the lines, by Campbell, and to ask whether they would include the 400 acres; when Welch said he might send the lines, and take their money; but it was unnecessary to tell them and others to proceed and make their surveys, for that they closed their survey by' the river.
Supposing Welch a partner in this land, and that this charge were made out by satisfactory evidence, its weight would depend very much on the good faith of Welch’s declaration. There is a good deal of evidence, tending to shew that none of the parties expected the line to take so much land on the north side of the river; nor is it strange that they should err in their conjectures on the subject. The line was a straight course of 15 miles and better, through an unsettled mountainous country, and the windings of the river would be the main circumstance to determine, what land on either side, it would take in or leave out. The same means of information were open to all. Any person who chose to run a straight line from the given corners above and below, might ascertain how much land it would include on the north side, just as well as Welch. It would be difficult, therefore, to conceive, that Welch, in his messages, intended to deceive or defraud Hughes. Nor is it pretended that by those messages, he meant (if he had the power) to enter into a contract, changing the last line of the survey, and making the river the boundary. Hughes well knew that this line would stand in the patent, precisely as it stood in the survey, a *457 straight line. He had in his own power all the means of arriving at perfect certainty; and the survey gave him full notice. He ought then, in common prudence, to have run the closing line, and not to have rested on the opinion of any body as to its crossing the river.
But, it is useless to consider how far the declarations or admissions of Welch, taking him as a partner, would affect the rights of M' Clung and Moore, until it be first proved that he was a partner. The bill specially charges, that he was a partner in the 43,417 acre survey, and that this was proved by a written contract, and also by the deed from Moore to M’Clung, which contains an exception of WelcKs claim; and particular interrogatories are put, to the defendants, to answer whether there was not a written contraet, with a prayer, that they be compelled to produce it. In answer, the defendants explicitly declare, that there was no contract, by which Welch was a partner in the 43,417 acre survey. They set forth a contract bearing date the 38th of August, 1793; by which they and Welch were to be equally interested in taking up lands on Gaulcy river. Tins contract appears to have been reduced to writing, after tlie entries made under it were located; as it specifies the seven entries to which it applies, and states that the lands which they embrace, (amounting by my calculation to 50,783 acres,) were held in equal shares by the partners. They set forth another agreement, dated the 20th of September, 1794, by which Moore was to furnish warrants for 60,000 acres of land, and M’ Clung to locate them on Gauiey river and Us waters; Moore to pay all expenses, and M’ Clung to have one fourth of the proceeds, when the land should be sold. This contract is signed by M!Clung, but not by Moore; and Welch, who is the subscribing witness, annexes to his attestation this remark, that it was acknowledged by JVClung, and the next, day, Gol. Moore, after reading the article, agreed to the contents, hut did not sign It, because v'.hn meeting between them being on the great road, there was no per* and ink. 'This is the agree *458 ment, (as seems acknowledged on all hands,) under which the entries were made, (except one,) which compose the 43,417 acre survey; and to this agreement, it is most clear that Welch was no party.
To prove that he declined a partnership in this adventure, M’Clung files and refers to an agreement between Welch and himself, dated in May, 1807. This agreement, referring back to the original contract between Moore, M’Clung and Welch, states, (by way of recital,) that 54,000 acres were taken up under it: that then, Welch declined a further partnership: that Moore and M’Clung agreed to go on: that Welch, at the instance of M’Clung, agreed to assist him in locating and surveying; for which service, M’Clung was to make over to him all right, title and claim to 4,500 acres out of his share of the partnership concern of 54,000 acres, to be adjoining Welch’s division, in case M’Clung’s share should join Welch’s. After the recital, the agreement states that Welch had performed his undertaking to the satisfaction of M’Clung; for which, M’Clung binds himself, &c., in the penalty of $ 20,000, to perform his part; that is, to convey the 4,500 acres. Thus, the written contract called for and produced, as well as the subsequent contract between M’Clung and Welch, shew that Welch was not a partner in the 43,417 survey. As to that part of the deed from Moore to M’Clung, which excepts the claim of Welch, the answer of Moore explains it thus. Previous to the sale to M’Clung, it had been, discovered that the inclusive survey of 43,417 acres had taken in a part of the joint property, the 54,000 acres; and the exception meant to exclude Welch’s proportion of this part from the conveyance. What this part was, is seen at once by recurring to the first contract, and the surveyor’s statement of the entries, on which the 43,417 acre survey was made. The contract shews that one of the entries, in which the three partners had a joint interest, was “ an entry dated the 1th of June, 1792, of 14,562 acres, part of a location of 17,562 acres;” and the surveyor’s *459 statement shews, that this same entry was one of those, on which the 43.417 acre survey was made. To the amount of his proportion of this entry, Welch had an equitable interest; but, if he had owned the whole entry, (thus accidentally included,) it would hardly be contended, that this would constitute him so far a general partner in the Various other entries comprised in the whole survey, as that (under the rule of law making the admissions or acts of one partner binding on the firm) his declarations and admissions would control and alter the written calls of the survey, or raise such an equity against Moore and M’Clung, as would postpone their legal rights to those acquired under a younger patent. A partnership is a voluntary contract between two or more persons, for joining together their money, goods, labor, and skill, or either or all of them, upon an agreement that the gain or loss shall be divided proportionably between them; and it is upon this community of profit and loss, this mutual confidence, and the character held out to the world, that the rule rests, making the acts and declarations of one partner binding on the rest. The very foundation of the rule is wanting here. This limited and accidental interest, in a single entry, could not make Welch the partner or agent of Moore or M} Clung, so as to bind them by his declarations; and as to any joint general interest, I can find nothing that weighs as a feather, against the strong evidence I have stated, proving that he was not a partner. A paper is found in the record, purporting to be an agreement, by which Moore, M* Clung and Welch sell to Susanna Wilson li)5 acres of land, and bind themselves to convey it to her, &c. How this paper came into the record, I cannot perceive. It is not an exhibit either in the bill or answers; nor is there a tittle of evidence going to authenticate it in any way. I should not, therefore, notice it, but that it seems to have bad weight with the worthy Judge who decided the cause below. Although the name of Welch is in the body of the agreement as a vendor, it is *460 executed only by Moore and M’ Clung; nor is there any evidence where the land lay, unless we consider this as proved by the deposition of D Stuart, who says, Welch refused to sign the agreement, saying he would take his land on the other side of the river. This would be slight proof, even if the witness were unimpeached; but, it is more especially so, as his situation (contesting the same point with the same party, against whom his evidence is given) goes strongly to his credit. But, take his evidence as true, and it amounts to this. Welch refused to bind himself to convey on the N. West side of the river, because he would not take his land there: and this was yielded to by all parties. Now, if Welch had been a general and joint partner in the whole survey, he could not have disclaimed an interest in any part of it, before a division. His execution of the contract, jointly with his partners, both they and the vendee would have had a right to insist on; but they had no such right, as he was interested only-in a single entry, which, he might well contend, lay entirely, or principally on the other side of the river. This, therefore, certainly does not prove a partnership. There are several depositions as to declarations of Welch, M’Clung and Moore, that Welch had an interest in the 43,417 acre survey; but these may either be explained by the limited interest I have mentioned, or are fully rebutted by counter evidence; and if not, would deserve little weight; because the conversations they relate, were loose and vague, and the witnesses under a bias, which goes strongly to their credit. This is especially the case, with those who testify as to the declarations of Welch, that the closing line would not cross the river. Campbell acknowledged himself interested; and Fitzwater and Stuart had land within that same closing line, if it was, permitted to cross the river. Without deciding on the competency of these witnesses, I must say, that I could never feel safe in receiving their evidence as proof of the parol declarations of their adversaries; going to establish the very fact, on which their own *461 cities depended. Upon general principles, therefore, I think there is nothing in the case to justify a re-examination of the law-judgment by a Court of Equity.
2. But if this question were more doubtful than it is, I think the second point, to be considered, to wit, the doctrine of caveats, as settled by this Court, would bé entirely conclusive of the case; and on this ground, in my judgment, the decision ought to be exclusively placed.
In the discussion of this point, I shall consider the ease of Noland v. Cromwell, 4 Munf. 155, as binding authority. I shall do so, first, because Noland v. Cromwell, was decided by a full Court, on great consideration, with the, express view of settling finally the jurisdiction of equity in such cases, and has, ever since its decision (now upwards of twelve years) been taken as giving this law to the subject. Such cases ought not to be disturbed; for (as has been well said) it is of more importance to the community that the law be settled, than how it is settled. When it is clearly understood, that the solemn decisions of this Court are to stand, counsel will know how to advise their clients, and litigation will he discouraged. Who can tell how many titles we might shake, how, much litigation we might set afloat, by overruling now, the case of Noland v. Cromwell? Perhaps these remarks might have been spared, when it is recollected, that in the case of Jackson v. M’Gavock, (argued since the present case, and before throe of the same Judges) we, after hearing a long argument assailing the authority of Noland v. Cromwell, stopped the reply, declaring that we considered Noland v. Cromwell as settling the law at the date of the decision; though the effect of subsequent statutes on that case, was open to argument. That their effect is nothing, will be shewn in Jackson v. M’Gavock.
Taking now, the case of Noland v. Cromwell as settled law, I will enquire whether it does not govern and decide the case at bar.,
*462 In Noland v. Cromwell, the bill charged fraud and combination between the defendant and the surveyor. In this Court, the case was decided on the preliminary question, whether in any case equity could relieve on a bill suggesting no excuse for failing to caveat. In the argument of this question, the bill was to be taken for true, and the strongest case which could arise out of it, as established; and this course was no doubt taken, because (in the words of the Court) “ it has been thought best to meet the question in full, and endeavour to put it at rest in future.” The opinion of the majority of the Court was delivered by Judge Fleming. The following extracts will shew the nature and extent of the decision. It begins thus: “ After the solemn resolution of this Court upon the question of jurisdiction, rendered in the case of Johnson v. Brown, which was founded upon former decisions, and particularly upon that in the case of Jones v. Williams; after the accession to this decision by Judge Tucker in the case of Depew v. Howard, on the ground of its being the established law of the land; after this rule of property, sanctioned by the opinions of all the successive Judges of this Court, to the number of perhaps seven or eight, prior to the present organization thereof, had been promulgated as the law of the land, and hundreds of our citizens may have regulated their transactions thereby, it might have been reasonably supposed, that the point, at this day,' had been at rest. If there were even error in the opinion of all these Judges; if the solemn decisions of this Court, upon the point, were even replete with error; that error, upon general principles, had better be acquiesced in, than corrected at this late day. But no such error has been committed ; and we owe that deference to the decisions of former times, that we ought not to suppose that those decisions were rendered without due consideration. We ought rather to admit the possibility of heing ourselves mistaken. On authority, therefore, the question is irrevocably settled; and on principle also, we think it rightly settled. The *463 point seems to be, as thus established, that although a party may be let into a Court of Equity, on grounds which he could not have used on the trial of a caveat, and which, in fact, make another case, or upon a ease suggesting and proving that he was prevented by fraud or accident, from prosecuting his caveat; he is not to be sustained in a Court of Equity on such grounds as were or might have been brought forward on the trial of the caveat.” The opinion then proceeds to detail the reasons of the decision; That the State having much vacant land for sale, it was important to have it settled, and the titles thereto quieted, as soon as possible; that for this purpose, the Legislature constituted a peculiar tribunal, and made provision for the speedy decision of the whole law and equity of the case, on the trial of the caveat, prior to the emanation of the patent; that it was important, in relation to this extensive territory, to act by general rules, and establish a general criterion as to notice; that the act meant to cut up the numberless doubts and disputes as to notice or no notice, and to establish a general criterion analogous to the pro - visions of the registration acts, which do not permit any person to aver the want of notice of a deed duly recorded; that the notice principally established by the act, is the entry in the surveyor’s book, open to all; which, when followed up by a survey, directed by law to be made shortly thereafter, affords completo notice of the claim; that of this survey, it is not competent to adjacent adventurers in aver an ignorance; and that if a particular case of hardship should be found to exist, it must yield to the genera! policy of the statute, which acts by genera! rules, anti adopts, of necessity, a general criterion; it being better that hardship should be endured by an individual, than that the general policy of the Legislature ehould be defeated.. According to this (jase, then, a party may he lot into equity ttpon grounds which he could not have used on ¿he trial of the caveat; or upon a case suggesting and proving that he was prevented by fraud o? acñdcnt from prose ■ *464 cutting his caveat; but not on such grounds as were, or might have been used on the trial of the caveat. How then can the bill before us be sustained, which, so far from making out a new case of which the plaintiff could not have availed himself on the trial of a caveat, shews a case, every fact and circumstance of which was available on such trial, and might have been submitted to that tribunal, and does not suggest even, that the plaintiff was prevented by accident or fraud from prosecuting his caveat?
The Chancellor seems to think it sufficient to give equity jurisdiction, that the case, as appearing from the evidence, should shew a good excuse for the plaintiff’s not having prosecuted a caveat. I question this exceedingly* The general rule is, that equity has no jurisdiction in such cases; but, if fraud or accident has prevented a resort to the caveat, equity will relieve. Ought not the bill, then, to state expressly, that fraud or accident has intervened ? Where are you to look for the plaintiff’s case, but to his bill ? If that does not give jurisdiction, it would be demurrable; thus cutting off the evidence entirely. Again. No evidence can be taken which is not relative to the matters in issue. Now, if the bill alleges neither fraud nor accident in excuse for not filing a caveat, how can the plaintiff • take evidence to prove such facts ? They make no part of his case. The defendant has had no notice by the bill, that they would be relied on. He has not had the benefit of his answer to the allegation. He has no warrant for taking countervailing evidence. I do not agree with the Chancellor, therefore, that the case made out by the evidence will give equity jurisdiction, where the case stated in the bill gives none. Such a position is as directly opposed to the general rules and principles of equity, as it is to the particular case of Noland v. Cromwell, which expressly says, that to give equity jurisdiction, the plaintiff must suggest and prove that he was prevented from prosecuting a caveat by fraud or accident*
*465 But, if the Chancellor’s idea were correct, I do not think the case made by the evidence furnishes a good excuse for failing to caveat. The survey of Moore and M’ Clung was prior to the plaintiff’s entry; and of this survey, he had not only legal, but actual, notice. He knew that this was an inclusive survey, setting out from Gauley river above, running round a largo body of land to the river 15 miles below; and then, to close the survey, calling for a straight line, not for the river according to its meanders. The Chancellor seems to think, that it could never have been supposed by the plaintiff, that this closing line would cross the river, 1st, because there was no call to cross; 2d, because such crossing would have gone into the county of Kanawha, for which the surveyor had no authority.
This last objection is founded on a mistake of the fact. By adverting to the law establishing Kanawha, (12 Hen. Slat. 670,) it will be seen that the N. E. line, cutting off part of Greenbrier, runs from Cumberland mountain to the Great Kanawha river, crossing the same at the end of Gauley mountain; thence along said mountain to the Harrison line. Now, the maps shew us, that the part of Gauley river embraced by this survey, is some distance south of Gauley mountain. Both sides of the river, therefore, were in Greenbrier; and the line, in crossing the river, did not run into Kanawha. In December, 1795, (after the date of Moore’s patent,) the county line was changed by the Legislature, from Gauley mountain, to Gauley river.
As to the first objection, that the line could not cross the river, without, calling to cross, I understand the surveyor Shanklin to say, that he had known other such cases; and the case of Hughes itself is such an one. There is no call in his survey to cross the river, and yet it docs crocs, and take in three or four acres on the south side. But, the conclusive answer to both these objections is, that the question whether the closing line could cross the river, is purely a legal question; a question of boundary arising on the calls of the patent, decided in the action of ejectment, and (as we *466 must take it, while that judgment stands,) correctly decided; the Law Court having decided that the closing line could in law, and did in fact, cross the river. The plaintiff is charged with knowledge of that fact, by his notice of the survey; and justly so charged, as he had it fully in his power to ascertain the actual course of the line, and it was gross negligence in him, not to have done so.
Upon every view of the case, therefore, I think that the decree should be reversed, and the bill dismissed.
Judge Green.
The judgment at law must be considered as conclusively settling the fact, that Moore’s patent includes the land in controversy; there being no impediment to a full and fair investigation of that question in the action of ejectment. If the Court of Law erred in any way on that point, it is not competent to a Court of Equity, again to investigate the question of boundary, and to correct the error, if any-existed.
Whether the plaintiff in the Court below, was entitled to any relief in equity against the legal title of the defendant, depends on two questions: First, whether he had a better equitable title to the land in question than Moore had, which would have been preferred in the Court of caveat, if he had prosecuted a caveat before Moore’s patent was issued? And if so, secondly, whether, having failed to prosecute a caveat, be was entitled to relief in a Court of Equity, after the patent issued ? The facts, upon which these questions turn, are as follows:
Prior to the 28th of August, 1793, Andrew Moore, William M’ Clung, and Alexander Welch, the surveyor of Greenbrier county, located upwards of 50,000 acres of land in the names of Moore, and of Moore and M’ Clung, on the waters of Gauley and Meadow rivers, in which the partners were equally interested. The original agreement of these parties was, to locate 100,000 acres; but on the *467 28th of August, 1793, dlkxander Welch retired from the partnership, and Moore and M’ Clung entered into a new contract, which the parties proceeded to execute forthwith. This contract was verbal, and not reduced to writing until the 20th of September, 1794, after the locations under the contract, and the survey of the lands located, were actually made. The terms of this last contract were, that Moore should furnish to M’Clung land-warrants to the amount of 60,000 acres, pay all the expenses of locating, surveying, &e., and give M’Clung one-fourth of the land which might be located under these warrants; and M’Clung was to locate, direct and have surveyed, the above quantity of land, ir' if so much was to be found unappropriated, lying, adjoining, and on the south sideof Gauley river, between the said river and surveys made for said Moore (and others, naming them) along the south side of Gauley river, below Homminy creek, and joining the above claims, and other prior claims, so far as the Kanawha road and bounds of the county line of Greenbrier.”
The first entry made under this last contract, was dated Septembers, 1793, for 11,907 acres, of which only 6,040 acres wore included in the survey upon which Moore’s patent issued. It began in one of the lines of a survey made in the name of Moore, for 20,000 acres under the former contract, which lay on the south side of Gauley river; the lines of which nearest the river, ran nearly parallel to the river, and the nearest of which were about three miles from the river. The entry beginning at one of the corners of this survey, calls to run with three lines of the survey of 20,000 acres nearest to the river, and to extend for quantity parallel to the lines of the old survey, so called; this location was the uppermost of all those included in Moore’s patent, and lay almost entirely above Homminy creek.
The next entry made February 11th, 1794, for 8,300 acres, lay next below the former, and called to join the north east of the said survey of 20,000 acres, and to run north west with the lines of said survey, down different *468 branches of Gauley river, and to continue nearly north west, leaving said survey to Gauley river; and thence, to extend up the Gauley river, and thence around northeastwardly to the beginning, for quantity.
Next below the entry of 8,300 acres, lay an entry of 17,562 acres, made June 12, 1792, not under the contract between Moore and M’Clung, but under the previous contract between Moore, M’Clung and Welch; of which 3.000 acres being withdrawn, the balance 14,562 acres was included in the survey upon which Moore’s patent in question issued. This entry calls to begin in a line of said survey of 20,000 acres, and to run with two long lines of that survey; and thence extending S. W. and N. and N. W. down branches of the Meadow river and Gauley river, to include the land in the forks of said rivers, and up said Gauley river waters around for quantity.
The two last entries were made September 19th, 1794, after the survey was made, and the day before the contract was reduced to writing. The first for 4,515 acres calls to join the southeast and southwest of the entry of 17,562 acres, to include part of the waters of Meadow river for quantity. The other for 10,000 acres joining the southwest of the entry for 4,515 acres, and to include waters of Meadow and Gauley rivers for quantity.
The survey was made by Welch on the 9tb, 10th, 11th and 13th days of September, 1794; and the patent issued June 22d, 1795; so that the survey must have been returned to the Register’s office before the 22d of December, 1794. This survey began at a large poplar between the Gauley river and the line of the 20,000 acre survey, 870 poles from the latter, and several hundred poles from the former, and the corner of a survey of 5,867 acres made for Moore on the 8th and 9th of September, 1794, and running with the line of that survey 870 poles, to the 20.000 acre survey; then with the lines of that survey, and leaving it to a corner on the top of Gauley river ridge (on the south side,) and thence N. 67, E. 5,060 poles to *469 the beginning. It appears that all the land on the south side of Gauley river, between this last line and the river, not included in this survey, had been surveyed for Moore before this survey was made. This appears from the in» elusive survey afterwards made for Moore, which includes all this land. The patent describes the land as lying on the south side of Gauley river, and on Homminy creek, and on both sides of Meadow river, a south fork of Gauley river, and including several other branches of said river. This patent excepts many prior titles included in the survey on the south side of Gauley, but none on the north side; although it. is said, though not proved, that there were many such on the north side included in the boundary of the survey as now claimed by M’ Clung. This closing line was not actually run at the time of the original survey nor until 1807, when it was found to include several thousand acres on the north side of the river, and amongst the rest the land claimed by the plaintiff. Shortly after this survey, Moore sold this land to Morris and Nicholson of Philadelphia; and in the fall of 1794, James, an agent for Morris and Nicholson, came to Virginia to see the land, and William llenwick, John Patterson and the said James, examined the land in company with Welch and M’Clung, to see whether it answered the description given by Moore to Morris and Nicholson; and the laud was surveyed in the fall of 1794, under the superintendence of these persons. It does not distinctly appear, whether this survey alone, or other surveys above and below it on the river and surrounding it, were sold to Morris and Nicholson; though the latter, I think, may be safely taken to be the fact; for, in January, 1795, Moore procured an order for an inclusive survey, which was returned and recorded as surveyed in May, 1795; this survey including the land on the river above and below the survey of 43,417 acres, and other lands surrounding it, to the amount in all of 100,230 acres. There is no evidence of any actual survey of any of these lands, between the time of the original sur *470 vcy and the year 1807, except as to the survey made in the fall of 1794, when James was present; and I think that very survey was returned and recorded as the survey made under the order of January, 1795, for an inclusive survey. The beginning corner of the survey of the 43,417 acres, made in September, 1795, was a considerable distance from Gauley river on the south side; and the lines run eastwardly, southwardly and westwardly, to the last corner, near, though not on the river, and on the south side. The closing line, about 15 miles long, was not then run; and it was then thought it would not cross the river, although it was afterwards ascertained that it did cross it four times, owing to several deep southern bends of the river, and embraced many thousand acres on the north' side. Accordingly, the report of the surveyor, and the patent afterwards issuing upon it, described the land as lying on the south side of Gauley river; and the contract made with Morris and Nicholson, was for the sale of lands on the south side of Gauley river. The fact, that the closing line crossed the river, was ascertained, when the land was conyeyed to Morris and Nicholson, in a very’ short time after the survey of September, 1794; though to what extent, was not then ascertained, as the line was not run. But, the survey was closed by the meanders of the river, according to the contract with Morris and Nicholson, and the meanders laid down as the boundary of the inclusive survey before mentioned. That the parties knew that the closing line would cross the river, and did not intend, by closing the inclusive survey by the meanders of the river, to limit their claim to the land on the south side, and abandon their right to that included in the original survey of 43,417 acres on the north side of the river, and that the inclusive survey was made with a view to procure a patent separately for the land sold to Morris and Nicholson, is demonstrated by the fact, that the report accompanying the inclusive survey (in describing what former surveys were included in that) states, that a part *471 only of the survey of 43,417 acres was included; and the part not included, could only have been that lying on the north side of the river. Welch, the surveyor, had an interest. in a part of the entry of 14,562 acres, included in the survey of 43,417 acres. How he disposed of it, does not appear; but, he probably sold it to M’Ciung, who also purchased the interest of Moore after the survey of 1807, which ascertained, for the first time, what land the closing line would include on the north side of the river.
Four months after, Moore’s survey of September, 17.94, was made; but, whether before or after the survey upon the sale to Morris and Nicholson was made, and the closing line ascertained to cross the river, (although that survey was hounded by the river,) cannot be clearly ascertained. Hughes, under the impression which seems to have beer?, eommon in the neighbourhood, that the closing line would not cross the river, (or more probably, that it would not cover the land he located,) entered 400 acres on the north side of the river, the land in controversy. But, before he made his survey, having a doubt, as ho says, “ whether Moore’s closing line, when it came to be run, might not include his entry,” he applied to Welch through a messenger, to know whether it was intended that Moore’s survey should cross the river, and to send the lines of Moore’s survey, as he wished to know whether his entry would be embraced by Moore’s survey; 45 and if it was, that ho would lift his entry, and be at no further expense about it;” when Welch answered, ísTelI Mr, Hughes, I could take his money and send him the lines of the survey; but, tell him to proceed in his survey, and secure his land., for, we do not intend taking one foot of land on that sida of Gauley river.” Accordingly, Hughes proceeded, though not till more than throe years after, to make his survey, and took out his patent. Several years after this patent was taken out, and before the survey of 1807 ascertained, that Moore’s survey included the land taken up by Hughes M’Cheng sent a message to Hughes, advising him to oree-. *472 a ferry on his land for the advantage of the lands in the neighbourhood. I think it probable, that Welch’s message to Hughes was sent before the survey, in pursuance of the contract with Morris and Nicholson; for, then his answer would be true. If after, it would be false without a motive.
Hughes’s claim to relief seems to have been founded chiefly on the ground, that Moore’s patent did not in fact cover the ground in controversy, and upon this ground principally, the decree of the Court of Chancery proceeded. The bill charges, that the complainant was not permitted at law to avail himself of the matters stated in his bill, by giving them in evidence to the jury. All evidence touching the question of boundary was admissible upon precisely the same principles, and to the same extent, both in a Court of Law and a Court of Equity. If the Court of Law erred in excluding proper evidence of the boundary, it was an error which a Court of Equity could not correct in any form. Fraud, accident, or surprise, which prevented the party from bringing his case fully before the jury, or after-discovered matter, which he could not bring before the jury, are the only grounds upon which a Court of Equity can re-examine, in any form, any fact put in issue between the parties, and decided at law. None of these grounds are alleged in the bill; and the true boundary of the land, according to the patent, must be taken to be as settled by the judgment at law.
A party acquiring an interest for valuable consideration in, or expending his money upon, the property of another, and induced or encouraged to do so by the fraudulent suppression of the truth or suggestion of falsehood, on the part of the owner, is entitled in equity to be indemnified, either by retaining the property, or otherwise recovering satisfaction from the owner. But, to give such an equity, a fraudulent intent must be brought home to the owner; or at least, a negligence so gross as to amount to evidence of fraud. A clear mistake or ignorance of his rights, on the *473 part of the owner, repels the imputation of fraud, and gives to the other party no equity; as was held in Stewart v. Luddington, 1 Rand. 403.
In this ease, the bill charges no such fraudulent misrepresentation or suppression, of the truth. The declarations of Welch, and the message of M’Clung, are stated for the purpose of shewing that they believed that the closing line would not cross the river, and to operate as evidence of the real boundary of Moore’s survey; and it is clear upon the evidence, that all parties laboured under a mistake in that respect, in which all were equally innocent; or, if guilty of culpable negligence, that charge attached as strongly on Hughes as on the other parties, the means of correcting the mistake being equally accessible to all. If, therefore, M’Clung, in other respects, has the better right, Hughes has no equity against him founded on this mistake as to boundary, either in respect to the property, or otherwise, except so far as to set-off the value of the permanent improvements, made by him, againslü/’ Clung’s elaim for rents and profits.
The only remaining ground upon which the plaintiff can elaim relief, is, that Moore’s entries did not cover the land in question, and that his survey did not conform to his entries: that, therefore, his original equitable right, before either party obtained a patent, was superior to Moore’s: that he could have prevented Moore from getting a patent for the land in question, by filing a caveat; and that his mistake in respect to the boundaries of Moore’s survey, encouraged by the mistaken declaration of Welch, was a sufficient excuse for his failure to file a caveat, and affords just ground for the interposition of a Court of Equity.
The bill does not suggest, or charge, that Moore’s survey included any greater quantity of land than his warrants and entries entitled him to. Nor does, it charge directly, that his survey did not conform to his entries, so as to put Shat question directly In issue. Yet it calls for the exhibition of the entries, and suggests that all of them wore *474 made on the south side of the river. Five entries are exhibited, as those upon which the survey was founded; one of which could not cross the river, beginning a great distance from it, and running in directions parallel to, and from it: one other is bounded by the river, and runs North-easterly from it, so as not possibly to cross it. The calls of the other three are such, that it may, or may not have been necessary to cross the river, in order to embrace the quantity of land called for; and if it were necessary to cross the river for that purpose, it is impossible to determine with any certainty,, from any thing in the record, whether these entries, duly surveyed, would include the land in controversy. If this question be proper to be enquired into, it will be necessary to have a survey in the cause, and perhaps an issue to be tried by a jury.
If Moore’s survey included lands not covered by the terms of the entries, Hughes locating, even after the survey, the land not covered by the entries, might have prevented the patent from issuing to Moore for the land in controversy, by a caveat; as was determined by the Supreme Court of the U. S. in the ease of Wilson v. Mason.
The question, therefore, is, whether in that case, Hughes, having failed to prosecute a caveat, can, under the circumstances of this case, successfully assert his originally prior equitable right, in a Court of Equity.
In examining this question, we are at the outset struck with the observation, that the Court of Appeals in Virginia, and the Supreme Court of the United States, (the latter, in administering the law of Kentucky,) seem to have come to opposite conclusions, in respect to the question, to what extent and upon what principles, Courts of Equity can entertain a jurisdiction in cases of conflicting claims to land, under the Land Laws of Virginia. In Noland v. Cromwell, 4 Munf. 155, the former held, that a Special Court having been appointed for the determination without appeal of all questions arising before the issuing of a patent, a Court of Equity had no jurisdiction after the *475 patent issued, unless the claim of the plaintiff in equity was of such a nature, that il could not have been asserted in a caveat; or, unless the party had been prevented from availing himself of that remedy, either by fraud or aecident, upon the ground that such was the policy of the law, in order to avoid multiplied and tedious litigation, and, I presume, also upon the ground, that in general, a Court of Equity has no jurisdiction to give relief, if the party had an adequate and simple remedy elsewhere, or that remedy were lost by his default.
The Supreme Court held, in Bodley v. Taylor, 5 Cranch; that it had been decided in the Court of Appeals of Virginia, whilst Kentucky was a part of that State, and confirmed by an uninterrupted series of decisions in Kentucky, that the true ground of jurisdiction was, that an entry was considered as a record, of which a subsequent locator might, and is presumed to have bad notice; that the jurisdiction of a Court of Equity, is not granted by statute, but is assumed by themselves; and that they cannot decidle as a Court of Caveat could, but must exercise the jurisdiction upon the general principles of the Court of Chancery. The effect of this description of the foundation of the jurisdiction is, that as it is an invariable maxim of a Court of Equity, that where both parties claim an equity, the prior equity must prevail, when neither party had obtained a patent, unless there were circumstances in the case, which, upon the general principles of a Court of Equity, would postpone him.
But, if the subsequent locator had acquired a legal title by patent, then another inflexible maxim of equity would immediately apply to the case, that when the equity is equal, the law shall prevail. All equities are equal, without regard to priority of time, or this maxim would be unmeaning. The inequality proceeds from fraud or culpable laches; and to deprive a subsequent locator, with the legal title, of the benefit, of this rule, it must appear that *476 he was guilty of some act or laches, which made it uncon-' scientious in him to insist upon his title.
Applying these principles to the case of a prior locator, contending with a subsequent one, having the legal title, if the latter had notice of the prior equity of the former, before he obtained his patent, he would be guilty of a fraud, if he proceeded; as in the case of a purchaser With notice of an unregistered deed. Le Neve v. Le Neve, 3 Atk. 646, Upon these principles it was held, that the prior entry being considered as a record, and the subsequent locator having notice of it, or if he had not, his ignorance proceeded from culpable negligence, his equity becomes inferior to that of his competitor; he loses the advantage of his legal title, and the prior equity will prevail.
In the very next case reported, Taylor, &c. v. Brown, 5 Cranch, 234, the Court asserted a still broader principle. Both parties claimed under military warrants issued under the proclamation of 1763. The law in respect to that class of claims, does not appear, at that time, to have required locations previous to survey. The plaintiff’s warrant was surveyed July 7, 1774, and his patent issued in 1792. > The defendant’s survey was made June 24, 1775. and his patent issued in 1780. The Court decided in favor of the plaintiff, declaring that if the plaintiff’s survey came within the law, (as it did,) the circumstance that the subsequent survey was made without notice in fact, cannot alter the case. 'His warrant only authorised him to acquire vacant land, and he took upon himself to find lands of that description. The principle of caveat emptor is strictly applicable. The principle upon which relief is granted, is, that the patent, which is the consummation of the title, relates to the inception of title; and therefore, in a Court of Equity, the person who has first appropriated the land has the best title, unless his equity is impaired by the circumstances of the case. The Court repeats, “ In this case, the first patentee is said to be a purchaser without notice. His warrant authorises him to survey waste and unappropriated lands; *477 and he undertakes to find land of that description. The Government acts entirely on his information; and the terms of his grant were, that the lands were waste and unuppropriated. It is not for him to say that, he had mi sin-formed the Government, and had surveyed appropriated, instead of vacant land, and thereby entitled himself to be considered as a purchaser without notice.”
Two cases are reported in 7th Wheaton, Miller v, Kerr, page 1, and Hoofnagle v. Anderson, page 212, which illustrate these opinions of the Supreme Court. In the first case, the plaintiff claimed under a military warrant, by mistake of the Register, stated to be for services in the Continental line, when in fact, the Executive had directed the warrant to issue for services in the State line. A part of this warrant was located in Ohio, when it was lawful to locate warrants for service in the Continental line, but not in the State line. The entry was on the 16th of .Tune, 1795; the survey, on the 30th of October, 1796; and the patent, in February, 1808. The defendant entered a warrant on the same land in 1806, and got his patent in 1807. The defendant, having the legal title, prevailed, on account of the mistake of the plaintiff’s warrant.
In the other case, a part of the same warrant was entered in Ohio on the 16th of October, 1790, surveyed on the 30th of October, 1796, and the patent issued October 9th, 1804. The defendant was entitled under this patent. The plaintiff’s entry was made on the 28th of May, 1806. The defendant succeeded.
The reasoning on which the judgment of the Court was founded in this last case, and the principle asserted in Bodley v. Taylor, would, I think, have led them to decide in favor of the losing party in the first case, if he had had the legal title, instead of the other party. They state, that the mistake in the warrant was perfectly innocent; and that when it was issued, the mistake was perfectly immaterial. For, the party had the same rights as to quantity of land, and was entitled to locate, it in the same districts *478 of country, whether it were issued for services in the Continental or State lines. In that case, the party would have had a perfect equity with the legal title, which would have protected him, but was not sufficient to enable him to assail the legal title of another.
I cannot assent to the principles on which Taylor v. Brown was decided. The defendant there had the legal title and equal equity. He had neither actual nor constructive notice of the-prior'equity, nor-was any laches imputed to him; and a Court of Equity, acting upon its ordinary principles, could not take away his legal right. The.idea of the patent’s having relation to the inception of the right, was entitled to no weight; for, the equitable right of the plaintiff was the same, whether he had obtained the patent or not, since the patent gave him no title. If the doctrine of relation could have any effect whatever, it would have overruled the patent of the defendant, and destroyed its effect. • This doctrine of relation, was acted on in several cases by Chancellor Wythe, particularly in Pickett v. Dowdall. In that case, Judge Pendleton, in delivering-the opinion of the Court,, said, that the defendant had the legal title, and the law was in his favor; that relations were legal fictions to promote justice, not to work an injury to innocent persons; and the defendant had judgment. Nor, do I consider that the argument founded on the supposed obligation on the party to locate vacant land, would affect the party, if he was guilty of no fraud-or negligence. Neither the warrant, nor the patent, specify the land as waste and unappropriated. The law directs that the owner of a warrant, wishing to locate any waste and unappropriated land, shall deliver it to the surveyor, &c. These terms meant unpatented land. The words unpatented, waste and unappropriated, and waste and unpatented, are used assynonymousthroughout the statutes; particularly all of them are so used in the 1st section of the act of 1779, ch. 12. To the same purpose were used the terms unpossessed land in the act of 1705, ch. 22, sec. 6; and “ not *479 before granted by patent,” in the act of 1748, eh. 19, sec. 2, To these waste and unappropriated lands, adventurers might have legal rights or claims, which are noticed in many parts of the statutes. Thus, in respect to actual settlers, it is provided, that all persons who, before the 1st of January, 1778, have really and bona fide settled themselves, &c. upon any waste and unappropriated lands, to which no other person hath any legal title or claim, shall be entitled to 400 acres, &c. If the statute liad not excepted such waste and unappropriated lands as others had a legal claim to, the settlement-right would have superseded a prior right founded on warrants. The case of Jones v. Williams, l Wash. 230, cited by the counsel in Taylor v. Brown, was a case between a settler claiming under this clause of the statute upon a settlement before 1775, and another claiming under a military warrant located in 1775. The judgment was for the latter; the statute only giving preference to settlement-rights upon waste and unappropriated lands, when no person had a legal claim, to it at the passing of the law in 1779; the Court in effect declaring, that this, although waste and unappropriated land, was not such waste and unappropriated land, as was subject to the claim of a settler, under that act. The direction to locate treasury warrants on waste and unappropriated land, does not except that to which another has a legal claim, if it be not a legal title by patent. The party locates at his peril, so far as that if he innocently interferes with the prior right of another, it is at the peril of being intercepted, in procuring his patent, by a caveat, or, if fraudulently, of being corrected by p Court of Equity, even after he has obtained his patent But, if he obtains his patent without actual fraud, he will be entitled to all the benefits of having the advantage of the legal title, which are sanctioned by the general principles of a Court of Equity.
Upon examining all the cases decided in the Court of Appeals which are reported,, and which, touch these quer *480 tions, I do not think that the proposition said in Bodley v. Taylor, to have been decided in Virginia, whilst Kentucky was a part of the State, that an entry was a notice to a subsequent locator, which tainted his legal title founded upon a prior patent, with fraud, was ever so decided in this Court. The only case, which seeins at first view to have established that proposition, is that of Johnson v. Buffington, 2 Wash. 116, which, as reported, seems to justify the proposition above stated. But, upon an examination of the original record, it will be found, that this report is entirely erroneous; and that the subsequent locator, who procured the first patent, had actual notice, and was guilty of gross fraud. The examination of these reported cases, will, I think, shew, that neither this proposition, nor those laid down in Táylor v. Brown, in respect to the doctrine that the patent relates to the entry as the inception of the title, and that an entry made upon,land not patented, is invalid,, if it had been previously located by another, are supported by any decision of this Court.
In Wilcox v. Calloway, 1 Wash. 38, Wilcox was entitled to the land by patent in 1764. Cox- petitioned for the land as lapsed, in December, 1767. Pending this petition, Wilcox sold to-Donaldson in 1768. In June, 1772, the petition was tried, and Donaldson was offered as a witness to prove, that the quit-rents, (the non-payment of which.was the cause alleged why the land was forfeited,) had been paid. He was rejected on the score of interest. The fact could have been proved by others; and the defence had been left to Donaldson. Cox had judgment. But, before he took out his patent, he assigned his right to Donaldson, who took out his patent in 1774. But in 1773, Cox not having taken out his patent, Wilcox caveated him for this cause, and recovered a judgment, and took out his patent in 1783. In the mean time, and pending the last caveat, Donaldson sold and conveyed to Calloway, the defendant. The Court declared that Calloway had the legal title; that the Court, if Donaldson alone had been de *481 leudant, would have had jurisdiction to vacate the patent to Donaldson as surreptitiously obtained, and to relieve against the judgment of forfeiture in 1772; Wilcox having a good defence, which was lost by mistake. But, Callo•way being a bona fide purchaser without notice, the bill was dismissed. Here fraud and mistake would have given jurisdiction against the party to the fraud, but did not avail against a bona fide purchaser.
In Jones v. Williams & Tomlinson, before mentioned, the plaintiff had filed a caveat, which was dismissed in consequence of an accidental miscarriage of the subpoenas for witnesses. On this ground, the Court examined the merits, as the General Court would have done upon a caveat, and dismissed the bill; the defendant having the legal right and prior equity.
In Reid v. Burnsides, 2 Wash. 43, the plaintiff prosecuted a caveat, and obtained a judgment. The defendant injoined the issuing of the patent; and pending this-suit, obtained a patent. Both claimed under settlement-rights; and the plaintiff, having the oldest right, succeeded in Chancery. This was the ease of an actual fraud.
Johnson v. Buffington, 2 Wash. 116. On the 25th of March, 1753, Peter Peters procured a warrant to survey 300 acres of land described in the warrant. The survey was made on the 28th of April, 1753, in the name of Frederic Vinegard, by order of Peters. On the 1st of September, 1790, Jacob Unrod, the heir of Frederic Unrod, called in the survey Vinegard, sold all his right to this land to Buffington the plaintiff, who obtained a grant the 26th day of April, 1791. Subsequent to 1783, Johnson, the defendant, under a treasury warrant, located 219 acres, and got a patent November 4th, 1789. Buffington, who was in the possession of the land, charged in his bill the facts above stated, and that Johnson had, before he got his patent, full knowledge of the rights of Jacob Unrod, and actually contracted with an agent of Unrod’s for the purchase of it; and it is fully proved, that in 1787, he did *482 make such a contract, and that there was an old settlement on the land in 1790: that Unrod’s widow, and her second husband, lived on the land after Unrod’s death; and about the year 1780, sold her dower interest in the land to a purchaser, who lived upon it. It was, therefore, a case of full notice and actual fraud, on the part of the defendant; and the plaintiff succeeded. No reason is assigned why a caveat was not filed by the plaintiff.
This statement is taken from the original record. The report of the case omits to state the charges in the bill of actual notice and fraud, supported by full proofs. This ease, reported without attention to these facts, has probably aided much in establishing the rules prevailing in Kentucky, and involving their land titles in such ruinous confusion. ' In this case, the counsel for the plaintiff admitted, that, where the equity was equal, and one of the parties had the law also on his side, he shall prevail; but if the lega|.title has been obtained by fraud, or by taking advantage of one labouring under a disability, he will not have the benefit of the advantage. The ground upon which the defendant’s counsel mainly relied, was, that the plaintiff’s claim was forfeited by a non- compliance with the rules of Lord Fairfax’s office, and that the defendant’^ entry was therefore valid. The Court decided, that under the acts of Assembly particularly relating to the Northern Neck, the prior survey continued to be good; and that only was intended to be asserted by the expressions, that it could not he re-granted by the Commonwealth: that it could not be considered as unappropriated, and consequently subject to be granted, under the act of 1785; and that the land was legally appropriated by Lord Fairfax, and consequently could not, under the act of 1785, be granted to any other person. The patent to Johnson was admitted to pass the legal title, which could not have been its effect, if the land could not-be granted by the Commonwealth,
*483 In Pickett v Dowdall, 2 Wash. 10, the plaintiff claimed under a warrant in 1741, and a grant in 1788; the defendants, under a warrant of 1762, and a grant from Lord Fair-fax in 1780, and under a warrant of 177.9, and a grant in 1780. The plaintiff’s bill was dismissed, on the ground of his taches, and that his rights had been forfeited, and Lord Fairfax had availed himself of the forfeiture, by granting the land to the other parties. The hill charged, that the defendants had notice of his title before they made their surveys, which the answers denied. The Reporter says, there was no proof of the fact. The Chancellor affirms, in his decree, that they had notice before their grants were obtained, and the. Court of Appeals say, “It is unnecessary to enquire if the Picketts had notice of Crop’s title; sine.'., if they had, it could not have affected them, unless Dow dull (who claimed under Crop) had been prevented In/ fraud from obtaining a legal title.
In Currie v. Burns, 3 Call, 183, the plaintiff had the el dost survey and youngest patent; the defendant, the youngest survey and eldest patent. The lauds were in the Northern Neck; and the plaintiff, having forfeited his right according to the rules of the office, Lord Fairfax had availed himself of the forfeiture, by granting to another; and thn Court refused to relieve against the forfeiture, on account of the plaintiff’s laches. In this case, no caveat could have been filed. The only remedy, if the plaintiff had right, was in Chancery.
Hunter v. Hall, 1 Call, 206. Hall had the prior survey, and Hunter one subsequent. Hunter caveated Hall. No judgment was pronounced on the caveat; hut Hunter dismissed it, and took out a patent. Hall filed his bill, on the ground of this fraud. The Court held, that the caveat not being dismissed on its merits, did not preclude Hunter’s taking out his patent, and that Hall’s survey was not warranted by his entry; and dismissed the bill.
White v. Jones, 1 Wash. 116. Plaintiff claimed under entry of 1740, and patent, of 1764; defendant, under entry *484 of 1743, and patent before 1764. The bill charged, that defendant had obtained his patent by a fraudulent collusion with the officers of the government, in procuring his pa» tent. The Chancellor dismissed the bill, on the ground, that if the patent was surreptitiously obtained, it was void at law, and the interposition of a Court of Equity was unnecessary. The decree was affirmed, upon the ground, that the plaintiff had not proved the fraud alleged. But, the Court declared, “ the plaintiff has stated a very fair and proper case for a Court of Equity. He was a purchaser, against whom the defendant unfairly and fraudulently obtained a preference; and in questions like this, when fraud is suggested and proved, Courts of Equity have competent jurisdiction, and can afford the most ample and adequate relief. But, in this case, the plaintiff has failed to support the charge of fraud.” The bill assigned no reason why a caveat was not filed. The effect of this case is, that in cases of actual fraud, a Court of Equity has jurisdiction, when there was no reason for failing to file a caveat, and will relieve; but will not relieve against a legal title without actual fraud, (the defendant pleaded that he had no notice,) in favor of a prior equity; and that an entry and survey is not such a notice to a subsequent locator, as of itself to affect his conscience, and deprive him of the advantage of his legal title, in a Court of Equity.
Johnson v. Brown, 3 Call, 259. The plaintiff claimed under a prior entry; the defendant, under a prior grant. The Court said, “We first consider the case on general principles, as a claim to setup an equitable interest, in opposition to a legal title; in which case, the plaintiff, to succeed, must shew a superiority of equity to the defendant; for, if it be equal only, the law must prevail.
“ Brown appears to have proceeded regularly, fairly, and legally, to acquire a title to vacant lands; and has, without fraud, obtained a patent. Johnson, on the other hand, appears to be a man searching for defects in his neigh- *485 hours’ land titles, hunting up and purchasing a stale and dormant claim, in order to disturb that title, &c.
“ But let us suppose that Johnson had such an equity as would, upon a caveat prior to the grant, have entitled him to a preference. It would be no ground for a bill to set aside the patent, unless it had been suggested and proved that he was prevented by fraud or accident from prosecuting a caveat. On these grounds, this Court has sustained bills of this sort, and enquired into the equitable preference, as if on a caveat. But, to admit such bills in all cases, without even suggesting an excuse for not having entered a caveat, would be to transfer the whole caveating business from the Courts of Law, where the Legislature have placed it, into the Chancery, which this Court cannot sanction. It was foreseen by the Legislature, that there would be interfering entries and surveys; and the caveat was the remedy for settling all those disputes, prior to the patent.” The Court also declared, that an entry, although declared by statute to stand good until the surveyor gave notice of the survey, was only the first legal step towards acquiring waste lands, and gives the person making it, (not an absolute legal right, but) if properly pursued, a preference to a grant. This was the unanimous judgment, of the Court.
Depew v. Howard and Wife, 1 Munf. 293 The plaintiff claimed under a prior entry and later patent. The bill charges that the defendant had notice of his prior entry, and fraudulently procured a survey, which had never been actually made, to be returned, and got a patent. But, before the patent issued, he filed a caveat, which was dismissed, “ either because he could not attend to it, the small pox being then at the Courthouse, or because the Howards resided out of the State, so that no summons could be served upon- them.” The bill was dismissed; the plaintiff having elected his remedy by caveat, and not having been prevented from pursuing it, by any fraud, accident, or mistake. I presume if he had not filed his caveat, or had *486 been prevented by his ignorance of the fraud, he might have claimed the aid of the Court of Equity, upon the ground of actual fraud, according to the principles of the former decisions. But he elected a remedy which was adequate, and lost it by his own default.
Then came the case of Noland v. Cromwell, 4 Munf. 155, before referred to. The literal terms of the opinions of the majority of the Court, in that case, seem to preclude a party from resorting to a Court of Equity in a case of actual fraud, unless it was such an one as prevented his resort to, or could not be tried in, a caveat. Most, if not all, possible frauds, might be tried in the Caveat Court, which proceeds upon equitable principles, before a patent issues to either party. If this was the intention of the Court, it contradicted many of the former cases, particularly White v. Jones. I do not think the Court had in their mind a case of actual fraud, in procuring the prior patent. Their expressions are general, and lay down a general rule, which might well be liable to an exception of the case of actual fraud; and in subsequent cases, the same Judges have given relief upon the ground of actual fraud* when the filing or prosecuting of a caveat was not prevented by fraud, accident or mistake. As in the case of Preston v. M’Kinney (not reported) in which the same Judges, except Fleming and Coaltek, gave relief upon the ground of the actual fraud of a sui’veyor in locating land in the name of his infant son, he having had actual notice that it was previously located by another, and getting a prior patent, without any fraud, accident or mistake, preventing a caveat. The patent unquestionably conveyed the legal title.
Christian v. Christian, 6 Munf. 541. In 1747 and 1753, the father of the plaintiff had entered and surveyed large bodies of land, which were never patented; but he and his devisees were in possession of them. He devised it to his four sons. The heirs of one of those sons, with actual and full knowledge of the facts, entered, surveyed *487 ru<l procured a patent for a part of the land. Henry and Drury Belt procured a patent, for a part, and John Booth and Thomas Staples for a part. The plaintiff fded caveats against the patents to the heirs of the son, and Booth and Staples, which were dismissed for his failure to file a copy in the proper Court, within the time prescribed by law. Tiie patents to the Bells had not been caveatedbut one of them had purchased the land patented to him, from one of the devisees of the first locator. The Court held, that as to the heirs of tiie son and Booth and Staples, the principies of Noland v. Cromwell, did not apply, because the sights of the parties could not have been adjusted in the Court of Caveat, and gave relief as t.o them; but. as to the Belts, as to whom the principles of Noland v. Cromwell applied, the bill was dismissed. All against whom relief was given, had been guilty of actual fraud; and those, against whom no relief was given, were guilty of no fraud, if the right of the parties to a partition, made the case unfit, for a Court of Caveat, as to the parties against whom relief was given, it had the same effect as t© the Bells, one of whom was not a purchaser from any of the devisees. But this was no impediment to a caveat; especially against parties not entitled to come into partition, as were two against whom relief was given. The decree is to be supported upon the ground of actual fraud only,
The last ease I shall mention, is that of Lyne v. Jackson, 1 Rand. 114. The plaintiff placed treasury warrants in the hands of the defendants to locate and survey for him; and for this service, he was to convey to him, as soon as the patents issued, a moiety of the land, and each part? was to bear one half of the expense. The defendant forged an assignment of ike warrants to himself, and located and surveyed them in his own name. Before any patent was issued, the plaintiff' filed his bill to injoin the issuing of them, and the sale of the surveys. He does not state that ho could not prove without a discovery, the facts ah . lege.d iu his bill; bni on the contrary, proves them by *488 witnesses. Pending the suit, another located and surveyed the land; and he was made a defendant by a supplemental bill. The Chancellor dismissed the bills; no doubt, upon the authority of Noland v. Cromwell, as he understood that case; the plaintiff having an unquestionable remedy by caveat against all the defendants, and to the prosecution of which not the slightest impediment existed. This decree was reversed, and the Register directed to issue patents to the plaintiff to be by him held liable to the claims of the original defendant, to be prosecuted in another suit. The Court was unanimous. There is no other possible ground upon which this decree could be founded, except that in cases of actual fraud, a Court of Equity has, upon its general principles, an original jurisdiction concurrent with that of a Court of Caveat, before a patent is issued, and after it is issued, even in cases where there was no impediment to a caveat.
Upon the best consideration which I can give to the statutes and those authorities, I conclude that all lands which had never been patented, unless particularly excepted by the acts of Assembly, are liable to location by any holder of a treasury warrant; that lands already located by one, may be located by other holders of warrants, and that these entries give to each locator an equitable right (not absolutely, but) upon pursuing his rights as the law prescribes, to claim a patent: that the one who first obtains a patent, has a complete legal title, of which he cannot be deprived, unless he has been guilty of an actual fraud in the acquisition of the legal title; or unless another party, who had made the prior valid entry, can shew that he has been prevented from asserting his prior right in the mode prescribed by law, (a caveat) by fraud, accident or mistake; in which cases, the Court of Equity will proceed .upon the principles which would have governed the Court of Caveat, if a caveat had been filed in time, and the legal title would not avail the defendant, to any purpose; and that in the cases of actual fraud, the party having such *489 prior right may resort to a Court of Equity for relief, upon its original principles, without alleging any excuse for not filing or prosecuting a caveat; a Court of Equity having an original concurrent jurisdiction with the Court of Ca-neat in case of actual fraud, before the patent is issued, and afterwards, an exclusive jurisdiction, founded on the original character of the Court. And that a Court of Equity has no jurisdiction, except in cases of actual fraud, and in which the party has lost the benefit of a caveat, by fraud, accident or mistake. By actual fraud I mean, the proceeding to procure a patent, after actual notice of a prior entry.
To recapitulate the effect of the cases cited; the ease of Lyne v. Jackson affirms the concurrent jurisdiction of a Court of Equity, before the issuing of the patent, in a case of actual fraud. The jurisdiction of equity, after the issuing of the patent, in a case of actual fraud, is affirmed In the cases of Wilcox v. Calloway; Reid v. Burnsides, (in which cases the patents were issued pending a caveat by the other party;) in Johnson v. Buffington, and White v. Jones, (in which cases the jurisdiction was affirmed, although no caveat was filed, and no reason assigned for the failure;) and such were the cases of Preston v. M’ Kinney, and Christian v. Christian. The cases of White v. Jones, and Johnson v. Brown, assert the doctrine, that equity will not relieve hut upon the ground of actual fraud, against the patentee, unless the party has been deprived of the benefit of a caveat, by fraud, accident or mistake. The cases of Johnson v. Brown; Depew v.
Howard, and Noland v. Cromwell, whilst they declare in general terms that a party cannot resort to a Court of Equity, upon any ground which would have availed him in a caveat, unless he was prevented from prosecuting a caveat by fraud or accident, (and it might have been said by mistake, for that is a species of accident,) do not advert directly and in terms, to the case of actual fraud in procuring the legal title. This was, I should think, rather an *490 exception to the general rule, overlooked by the Court in laying down the rule, than a case which they intended to embrace in the general rule, contrary to the prior decisions of the Court; which they would hardly have overruled intentionally, by laying down a general proposition, and not adverting to this particular case of fraud, or to the former decisions upon it; and the subsequent decisions on the same point, fortify this impression. Understanding Noland v. Cromwell thus, with an exception of the case of actuad fraud, I think it was perfectly right, and in conformity with the former decisions of the Court, and the spirit of the statutes.
This seems to me to be the effect of the judicial decisions on these questions; and I think the same conclusions are dictated by the spirit of our land laws.
When the Commonwealth opened the land office for the disposition of all the unpatented land from the Alleghany mountains to the Mississippi, for the avowed purpose of increasing the population of the State, and of raising funds to meet the pressure of the revolutionary war, not only by the sale of, but by the revenue to be raised by taxing the land, the public had a deep interest, not only for the purpose of effecting these objects, but to prevent unbounded and ruinous litigation, in respect to the land titles acquired under that act, that all conflicting claims to unpatented lands should be promptly and finally adjusted. The individual adventurers had even a greater interest in a speedy decision of their claims. In that case, if they failed in their claim to any particular piece of land, their injury would be inconsiderable, as they might still acquire, with very little addi» tional expense, the same quantity of land, equally valuable, or nearly so, in the vast range allowed for selection. But, if the decision of an adventurer’s rights was protracted by tedious litigation in the ordinary Courts, and in the ordinary forms, and subject to the delays of appeals and writs of error, that opportunity of indemnifying himself would be lost, in consequence of all the valuable land being in the *491 mean time occupied by others. To avoid these evils, the Legislature adopted a policy for expediting the decision of these questions, which had prevailed before the revolution, when the same motives for such a course existed, though not in the same degree. They allowed a person claiming a bettor right to unpatented land, to file a caveat, the effect of which was, to prevent, the emanation of a grant, until the right could bo determined. To enable him to pursue this remedy, no patent could issue*, until the survey had been six months in the Register’s office. A copy of the caveat was required to be filed in the General Court, within three, days after it was filed in the Register's office, or the caveat to be void. The defendant was to be summoned to the next Court, where the right was to be determined in a summary way, without pleadings; and no appeal or writ of error was allowed to the judgment. If the defendant succeeded, he was bound to take out his patent within three mouths, and the plaintiff succeeding, within six months; ■or any other might caveat them for that cause; and if the plaintiff succeeded, the defendant was entitled to a new warrant, for the same quantity of land. By the act of October, 1784, ch. 13, the Register was required to pay to the defendant in that case, the fees which the successful plaintiff paid to him, upon taking out his patent; and by the act of May, 1788, ch. 89, the caveat was directed to be dismissed, if the summons was not returned, or was returned not executed, unless the Court was satisfied that the failure to execute the summons was not owing to the default of the caveator. All these, provisions show a strong anxiety on the part of the Legislature, to coerce the parties claiming, to assert their rights in the mode prescribed by law, with promptitude and vigilance, to take out, the patent immediately, and to provide for the indemnity of the losing party as far as was possible. All these objects of expedition and indemnity would have been utterly lost, if the plaintiff was authorised to pursue his remedy in the Court of Equity, or in the Caveat Court, at his election, whenever he chose the *492 former. The delay in that Court, and by appeals, would be necessarily' great; and if the plaintiff succeeded, the de~ fendant could not have been indemnified. For, besides ^at, all the valuable land might be pre-occupied, he would lose his warrant and the fees he had paid to the public, without redress; both of which would have been restored to him, upon a judgment against him by the Caveat Court; and the provision of the statute that the caveat should in certain cases be void, and in others dismissed, would be fruitless and idle.
In addition to these mischievous consequences, contrary to the spirit of the law, (which induce an opinion that the Legislature did not intend to leave a concurrent jurisdiction to a Court of Equity to give a party in all cases the benefit of his prior equitable claim,) the general principles of a Court of Equity' forbid its taking jurisdiction, when the party has an adequate and simple remedy in another forum, with the exception of a few cases, in which it has an original and concurrent jurisdiction; of which description, are all cases of actual fraud.
I have considered it my duty to examine these principles, because of the manner in which this case, and that of Jackson v. M’Gavock,* (the latter particularly) was argued; and because it is understood, that the decision of Noland V. Cromwell was greatly disapproved of, and which is apparent from the decisions of the inferior Courts, and the acts of the Legislature of 1814 and 1819. These acts were probably passed under the impression that it had been decided, that even in a case of actual fraud, a Court of Equity could give no relief, unless the party had lost the benefit of a caveat by fraud, accident or mistake. The act of 1819 does not give the same remedy in equity, as the party might have had by a caveat; but only provides that the party might have such relief in equity as he might have had there, if no remedy by caveat had been provided. *493 If, therefore, a party came into equity before a patent issued, both parties claiming equitable rights only, the prior equity would prevail; but, if he came after the patent issued, the acquisition of the legal title, if bona fide acquired, would give to the equity later in point of time, Ihe advantage of having the law on its side; and the equity being equal, the law would prevail. This statute, therefore, whether prospective or retrospective, or both, seems to me to have no eiFeel upon these questions; for, a party would now come into a Court of Equity, after failing to file his caveat, upon the same terms that he was entitled to, and bound by, before the statute.
Nor does it appear to me, that the act of 1814, re-enacted in 1819, providing for the repeal of letters patent, has any effect upon these questions. That only allows such repeal, at the instance of one having a subsisting equitable right to the land, at the time he sues out the scire facias, and commencing before the date of the patent; and the Court is directed to decide the case, as law and equity may require. The plaintiff would, therefore, be determined to have a subsisting equity or not, precisely upon the samo grounds, as if he was prosecuting his right in his own name, under the act of 1819 aforesaid, after the patent had issued. Indeed, the object of both acts, being to vindicate only private rights, it would be absurd that these rights should vary as the party might think proper to pursue the one or the other of these remedies, in the name of the Commonwealth, or in his own name.
In the case at bar, there is no allegation by the plaintiff', that there was any fraud, accident or mistake, which prevented him from filing a caveat. But, on the contrary, he alleges that he intended to withdraw his entry, if he found that Moore’s survey included it. He cannot, therefore, claim to set up his right in the Court of Chancery, upon the same principles as he could have done in the Caveat Court, even if he could do that in ease he had been so prevented. He can claim no relief against the legal tille, un« *494 less it be tainted with fraud. No fraud is charged. The mistake of the parties in respect to the boundary, is only relied upon as a proof of the actual boundary; and in truth, there was no fraud. The fact that the land was included in the survey, whether covered by the entries or not, was no fraud either upon the plaintiff or the Commonwealth. The survey was made before the plaintiff made his entry; and it is not alleged that it included more land than the warrants and entries called for. If the river had run a straight course, or its bends had been westwardly instead of southwardly, the line would not have crossed the river, and there would have been no pretext for saying, that the survey covered land not covered by the entry. The mistake arose from the ignorance of the parties as to the real course of the river. All knew that this last line of the survey was a straight one, and not governed by the meanders of the river. The mistake was perfectly innocent and honest on all sides. If there was any negligence, it was imputable to both parties alike. Each had the same means to correct it, even if the surveyor had improperly refused a copy of the courses. The plat was in the Registér’s office, and a copy might, have been had there. There was no greater moral or legal obligation on the one party than on the other, to ascertain the precise location of the line. If thére was no fraud in making the survey as it was made, there was none in taking out the grant; as there was no change of circumstances, or in the state of the information, or rather ignorance, upon which the parties acted, which could have that effect.
Upon the whole, the decree should be reversed, the injunction dissolved, and the bill dismissed, but without costs.
Judge Coalter.
On a view of the answers, documents and depositions, it seems to be established that Moore, some time between *495 1791 and 1794, embarked in the speculations of that day, in surveying and vending large tracts of land, and had made a contract with Morris and Nicholson of PhOadelphia, to sell 100,000 acres in the north western parts of Greenbrier county, on the Meadow and Gauley rivers, lying on the south side of the latter. Whether he had made any conditional sale or not, before he began the locating, does not appear; but it is pretty clear, that such sale must have been made before the business of locating and surveying was closed; for, some dispute seems to have arisen, as it regarded the quality of the land, which seems to have been submitted to the opinion of certain arbitrators or viewers, who were called on for that purpose, and who examined the laud early in the winter of 1794, and shortly after the last survey of 43,417 acres was made, as hereafter mentioned. According to this contract with Morris and Nicholson, the land was to lie on the south side of Gauley.
It also appears, that about the year 1791, the said Moore made a verbal agreement with M’Clung and Welch, the surveyor, to assist in procuring the land;each party to perform certain services, and to be equally interested in the proceeds of sale: that prior to August, 1793, M’Clung and Welch had made entries and surveys, in part compliance with this agreement, and which are enumerated in c< written contract bearing date the 8th of August, 1793; the object of which seems merely intended to shew how far they had advanced with the business at that date, in order that Welch, who had determined to do so, might withdraw from the partnership, and leave Moore, and M’Clung to procure the residue of the land themselves. It was found, that at this time, entries and surveys had been made to the amount of 53,780 acres, or thereabouts, mclnding 3,000 acres, a part of an entry of 17,363 Reres, made 1.3th of January, 1793. These lands, I late if, for granted, were then surveyed: and at all event?, a survey oí 30,000 aero *496 of them, lying to the east of the 43,417 acre survey, hereafter mentioned, had been made.
It is admitted on all hands, that after the quantity of about 54,000 acres were located and surveyed, Welch withdrew; but, he was still entitled to oné-third of 14,562 acres, the residue of the entry of 17,562 acres above-mentioned, when that should be surveyed.
In this posture of affairs, Moore and M’ Clung agree to go on and locate the residue of the land, on certain terms, as will be seen by their agreement, which, I take it, was first verbal, but was reduced to writing on the 20th of September, 1794; in which it is stipulated particularly, that the lands shall lie along the south side of Gauley river, below Homminy creek, and joining the above claims and other prior claims, &,c. M’ Clung, it seems, applied to Welch to join him in this business, but he refused to be a partner, and M’Ciung then agreed to give him, for his assistance, 4,000 acres out of his share of the land first above-mentioned.
But it is to be remembered, that at this time, the 14,562 acres above-mentioned was unsurveyed, and that that location was precisely within the bounds mentioned in this last contract. It joins the 20,000 acre survey, is to run down branches of Meadow river and Gauley river, so as to include the lands in the forks, and up the said Gauley river waters for quantity. It cannot be said, I think, that this entry was intended to cross the river; and if it did, it would be far below the land in dispute. Thus the contract to locate, and the contract of sale, both call for lands on the south side of the Gauley river; and it would have been in violation of each, to cross it.
The next entry is of the 6th of September, 1793, being the first one made under the new agreement between Moore and M’Ciung, and is for 11,907 acres. This entry lies above Homminy creek, if it can be said to be any where; for, I have groat doubts whether it can be considered sufficiently special. It calls to begin at a corner of the *497 20,000 acre survey, and to pursue three lines to the third eorner. These lines lie in the form of a half-moon, from A, in the plat, and do not cover half an inch of the plat Lines are to be run parallel to these, so as to include the quantity; and so far from calling to go across the river, it is not even named; and if it did go across, I think, could not interfere with the land in dispute.
The next is the entry of 8,300 acres, made the 11th of February, 1794, and which lies along the river opposite the land in dispute, and is expressly bounded by the river, It is to run to it, then up it, and round for quantity. On this subject of entries on, or joining, large rivers, (as this Is charged in the bill to be,) without calling to cross them, f will refer to the case of Hunter v. Halt, 1 Call, 210, in order to shew the necessity of saying so in the entry, if it was intended to cross the river. The calls of the en. tries themselves, I think then, will not justify crossing the river; whilst the contracts for locating, and for sales of the land, and all the cotemporanoous declarations and early acts of the parties, shew that it never was intended to cross the river. Of this there is abundant and most conclusive proof; and I consider it a clear case on this point, independent of other considerations hereafter to be mentioned. So that, had the surveyor closed the open line by running on the north side of the river, they could have been met there, with success, by a caveat, and defeated on a younger entry.
But, let us pursue the history of this business further. On the 9th, 10th, 11th, and 13th days of September, 1794, Welch proceeds to make a survey of 43,417 acres, beginning some distance from the river and running round, and again approaching the river; and from the last station, he calls to run to the beginning, supposing be had begun so far from the river, that the closing line would not cross it; and after this, to wit, on the 19th of September, 1794, Moore made two other entries within the bounds of this survey, one for 4,515 aerea, and another for xn.oofl acres: *498 so that as to, this quantity, the survey preceded the entries. Neither of these entries cross the river; and if one of them would, it would be still farther down the river from the land in dispute, than either of the others. Welch is admitted to have been interested in this survey as far as one third of 14,562 acres aforesaid. This is admitted in Moore's answer, and in his deed to M'Clung the interest of Welch'is reserved; and as late as the year 1807, in the agreement for the sale of some land on the north side of the river to Mrs. Wilson, the sale is stated to have been made by Moore, M'Clung and Welch, and that the bonds for the purchase money were taken to them; and although he disclaimed any right to go on that side of the river, he was nevertheless interested in the survey.
'Soon after this survey was made, to wit: late in the fall, or in the early part of the winter 1794-5,.one James came on from Philadelphia, as an agent or referee on behalf of Morris and Nicholson, and insisted with Patterson and Renwick to explore the land, and see if it was equal to the description given of it. M'Clung attended them part of the time, and Welch, the surveyor and partner, made the survey. They ran round the land as Patterson says, I presume, by running the exterior boundaries; and when they came to the lowest corner of the 43,417 acre survey, and proceeded on the course of the closing line, they struck the river. It was high, and they could not cross; and they then closed the survey, by meandering the south margin of the river. This is clearly proved by several witnesses; and it is also proved, that though M' Clung had left them, he was informed that it was so closed; but that the closing line, had it been run straight, would have crossed the river. Where or how it would run on the other side, was not then known; nor was it known, until it was closed in 1807, when the surveyor ahd all the parties were much surprised to see how it ran, and how much land it took in on that side. An inclusive survey having thus in fact been made, it very naturally occurred to the *499 parties, that it would save trouble, and perhaps be more in the spirit of their contract, with Morris and Nicholson, to get an order of Court for an inclusive survey, which was procured on the 28th of April, 1795, and without further survey, l presume; for, wo hear of no other being made. An inclusive survey is recorded in the surveyor’s office on the--- day of May, 1795; a copy of which is in the record. This survey is bounded by the Gauley river, ft is admitted by Moore, that he made a deed to Morris and Nicholson; but when, or whether according to this survey, we are not informed; and when the contract was cancelled with them, we know not. It seems to have been put an end to, however, some how or other. I suppose Morris was unable to pay, and this land was taken back.
In this posture of affairs, or rather on the 20th of January, 1795, the appellees, supposing the Gauley river was the line between Greenbrier and Kanawha, make their entry with the surveyor of Kanawha, on the north side of the river, for the lands in dispute. This opinion, which must have been a general one in the country, that the river was the line, is another fact to shew that Moore, who entered in Greenbrier, could not have intended to take land in Kanawha. This is nearly about the time when the Sand was explored and surveyed as aforesaid; and consequently we find, that soon after they made their entry, it was rumoured that possibly M’Clung and Moore’s survey would cross the river by the closing line; and they sent to Welch the surveyor, to enquire if it did cross the river, and to get the courses of the survey. He sent them word that the survey did not cross the river, and they might go on and survey the lands, &e. How were the appellees to know, had they got the courses, that they would cross the river, when the surveyor himself did not know it, until he came to try the closing line, and struck the river; and years after, when he ran it out, was utterly astonished to find how it ran? M’Clung also, after this, and before 1807, (but at what precise time does not appear; *500 though it is charged in the bill to have been in 1803, or 1804,) sent the appellees word to make a ferry-boat, stables, cabins, &c. for the accommodation of travellers, so as 1° draw custom, and induce settlers in the wilderness on his lands, &c.; thus clearly recognizing their rights, and inducing them to lay out their money. All this is charged in the bill; which M’Clung admits, but says he sent them word, that if the land turned out to be his, he would pay them for the improvements. But this, so far from being proved, is disproved. In short, no claim is ever pretended to this land, until 1807, twelve or thirteen years after the transactions aforesaid; when, on going to close the line on the north side, it is found that it embraces a larger tract of country, now become valuable, Welch, however, well knowing there was no justice in the claim, positively refused to have any thing to do with it, or to join in the sales to the innocent holders of these lands, saying he would take his share elsewhere.
But again. On examining the entries on which this survey of 43,417 acres is said to have been made, I was struck with some marginal notes, and have been led to examine the patent for that tract, and compare the warrants returned with it, with those mentioned in the entries, and find that several warrants in the entries are not mentioned in the survey, and that others are mentioned in the survey, which are not in the entries; which shews a shifting of warrants not sanctioned by law. Thus in the 17,562 acre entry, 500 acres are said to be by warrant No. 25; 500 by warrant No. 2, and 6,759 by warrant No. 12,227; in all, 7,759 acres. None of these are mentioned in the patent. But, 3,000 acres of this entry had before been surveyed, which, deducted from the 7,759 acres above, would leave 4,759 acres of this entry, without warrants. And so of the entry of 8,300 acres; 2,000 acres ai’e by warrant No. 9,880, and 500 acres, by warrant No. 6,515. These are not named in the patent; which, added to the above, make 7,259 acres. But, the patent mentions warrants not in any *501 of the entries; as for instance, No. 7,730; 65,513; 9,889. Those may be enough to cover the 7,259 acres above, and it may be that no actual fraud lias ultimately been practised on the public. But, surely such shifting ought not to be countenanced; especially, when the parties had interested the surveyor with them in the surveys. These warrants may have been withdrawn, and probably were, and applied elsewhere; whilst the ostensible entry kept these lands covered, until other warrants could be procured. Such matter, coming out on a caveat, would have its due influence; and why some regard ought not to be paid to it here, I cannot at present see.
But again. Memoranda are made in the margins of the entry-book opposite the entries. Tims, opposite that of 17,562 acres, it is stated, ((14,562 surveyed and included in a survey of 43,417.” Opposite the 8,300 acre entry, is this note. “ Surveyed in survey of 43,417. This entry removed on account of an inclusive survey.” This must be the inclusive survey noticed above; in which it is stated, that it is made by such and such surveys, and by part of a survey of 43,417 acres, and the last part of this marginal note was made after that inclusive survey. It will be found too, that the other surveys amounted nominally to 47,557 acres. Deducting the 8,300 acre entry from the survey of 43,417 acres, leaves say 35,117; making in all 82,674. But when the inclusive survey is actually made, it turns out io contain 100,280 acres, or 17,556 acres of surplus land beyond warrants.
This entry of 8,300 acres was withdrawn then, in con• sequence of that inclusive survey, and some of the war rants at least, otherwise appropriated. How came it to be re-instated? It was withdrawn, I presume, as a counterpoise to what was thrown oif on the north side, by confining the survey to the river. It was, however, withdrawn, as appears by the surveyor’s books, on account of an. inclusive survey. How comes it, that the party now *502 claims this very land in dispute, by it; for, it is the very entry that lies nearest the land ?
In fact, this is the only entry that can touch the land in controversy. The surveyor, being interested, had it in his power to smooth over all these matters. But, they appear on the face of the appellant’s title papers; and though they are not charged in the bill, but have thus come out by his own exhibits, they are well calculated, I think, to induce a Court to look with no favouring eye on large speculating grants of this kind; especially, where so unjustifiable an attempt is made to use them, against the innocent and fair purchasers and improvers of the soil; and who have made their purchase and improvements with the knowledge and approbation of those now seeking to disturb them. It seems to me, that these acts of encouragement to the appellees to acquire the land, and spend their time and labour in improving it, are enough, of themselves, on the general principles of a Court of Equity, to protect them.
But, if there is any doubt as to this, surely all the circumstances combined are enough to take this case out of that of Noland v. Cromwell. The security into which they were lulled, is surely excuse enough for not filing a caveat. I must content myself, however, with referring to my opinion in the case of Jackson v. M’Gavock (now also under consideration) for a further illustration of this point; believing that on every ground there taken in relation to the caveat question, this is stronger than that case.
But, how it can be taken out of the general doctrine of one standing by, and even encouraging another to lay out his labour, time and money, in acquiring and improving land, and then claiming it, I cannot see.
On the whole, I think the decree ought to be affirmed.
Judge Cabell.
This was a case in which Hughes, a subsequent patentee, went into a Court of Equity, seeking to be relieved, *503 ,m the ground of superior equity, against a prior patent to Moore, under whom M} Clung claimed. The Chancellor granted the relief prayed; and an appeal was taken from his decision.
It is contended, for the appellant, that the decree is erroneous, because the relief which it grants, is founded solely on grounds, of which the plaintiff in the Court below, might have availed himself on the trial of a Caveat; and that, according to the principles settled by this Court, in the ease of Noland v. Cromwell, 4 Munf. 155, it is not competent to a Court of Chancery to grant relief on such grounds, unless the parly had shewn that he was prevented from filing a caveat, by fraud or accident; which, it is said, was not the case in this instance.
A majority of this Court are not disposed to question the propriety of the decision in Noland v. Cromwell; but doubts having been entertained as to the extent of that decision, it becomes necessary to ascertain the principle# which it really settles. This is to be dono by an examination of the opinions of the Judges, which were delivered seriatim. And in making this examination, it will be useful to determine, in the first place, what is universally admitted to have been settled by Noland v. Cromwell\ and then, what it is that is doubtful, or, as to which, a difference of opinion still exists.
The great contest, in the case of Noland v. Cm newel-' was whether, in all cases where the question between the parties was as to the equitable right to the patent, it was not as competent to go into a Court of Equity to settle that question, after the patent had issued, as it would have been to go into a Court of Caveat for a settlement of it, before the patent had issued; and that, "without assigning any reason for not having filed a caveat. Or, in other words, whether on all questions of this sort, a Court of Chancery had not, after a patent, concurrent jurisdiction with the Court of Caveat, before the patent. Judge Coal-supported the affirmative of the proposition. But, or *504 this point, all the other Judges were of a different opinion. All the other Judges were of opinion, that the general rule was that, after a patent had issued, it was not competent to g° into a Court of Equity to set it aside, unless the party-assigned a good reason for not having filed a caveat. This general rule, may, therefore, be considered as indisputably established.
But, all the Judges who were of opinion that this was the general rule, admitted that there were exceptions to it; that there were some cases in which a Court of Equity would have jurisdiction, after the patent had issued, although no excuse should be suggested or proved for the failure to file a caveat.
The only question, therefore, as to the extent of the decision in Noland v. Cromwell, is as to the exceptions to the general rule established by that case.
A reference to my opinion will show that I thought the case of fraud was an exception; because, fraud constitutes one of the ancient, established and most essential grounds of equitable jurisdiction; and consequently, that in all eases where the acquisition of the patent was tainted with fraud, the Court of Chancery might set it aside, although no reason should be assigned for not having filed a caveat.
To guard against any doubt or misapprehension as to the kind of fraud, which, in my opinion, constitutes an exception to the general rule, so as to authorise a Court of Equity to interfere where no reason is assigned for the failure to file a caveat, I think it proper to state, that I do not mean mere constructive fraud from the implied notice of the entry or location being a matter of record. That would be to destroy the general rule entirely, by giving to the Court of Equity concurrent jurisdiction in all cases whatever, since all our titles to land are founded on entries or locations. I mean actual fraud; such as proceeding to procure a patent after actual notice of another’s prior entry, or equitable right.
*505 The other three Judges delivered a joint opinion: and the doubts on the subjeet arise from the broad expressions used by them, without any express qualification or exception. They say, “the point seems to be, as thus established, that although a party may be let into a Court of Equity, on grounds which ho could not have used on the trial of a caveat; and which, in fact, make another ease; (in reference to that which he might have availed himself of on such trial;) or, upon a case suggesting and proving that he was prevented by fraud or accident, from prosecuting a caveat; he is not to be sustained in the Court of Equity, on such grounds as were or might have been brought forward on the trial of the caveat. ” These expressions are so general that, construed literally, they would exclude from the jurisdiction of a Court of Equity, even actual fraud, unless a proper reason were assigned for not filing a caveat. Could the Judges have so intended ? I presume not; because It would be to take from the Court of Equity one of its ancient and established grounds of jurisdiction; because, it would be in opposition to former express decisions of the Court upon the very point; While v. Jones, 1 Wash. 116; and because the same Judges, or at least two of them, in the subsequent cases of Preston v. M’Kinney, and Christian v. Christian, granted relief in cases of actual fraud, although no reason was assigned for not having filed a caveat.
I am, therefore, of opinion, that all the Judges who laid down the general rule in the case of Noland v. Cromwell, intended that actual fraud should constitute an exception to it; and, consequently, that according to the true construction of that case, a party wishing to set aside a patent, may go into a Court of Chancery for that purpose, without assigning any reason for not having filed a caveat, in all -eases where the acquisition of the patent is tainted with actual fraud.
If remains to apply this principle to this case.
*506 The entries under which M’Clung claims, are prior to by which Hughes claims the land in controversy. Those entries shew by their terms that they were made on tbe south of Gauley river. The surveyor’s certificate of survey recorded in his office, and transmitted to the Register’s office, states, that the land embraced by it lies on the south side of Gauley river. The survey began at a point on the south side of the river, and a considerable distance, seven hundred poles from it. From that point it ran southerly, a great distance; then westerly, nearly parallel to the general course of the river, and then northerly to the top of Gauley river ridge, without stating how far from the river, but certainly on the south side of the river. From this point the survey calls for a straight course to the beginning. Gauley river is a large river, certainly one of the largest in that part of the State. There is no mention made of the river in the survey, except that it describes the land as lying on the south side; and except that the last corner, is stated, as aforesaid, to be on the top of Gauley river ridge. The closing line, from this last corner to the beginning, was not actually run and marked,, as the law requires, but was laid down by protraction. It was, however, a straight line; and although it was fifteen miles long, yet as the point from which it was to begin, was on the south side, and as the point at which it was to end, was several hundred poles from the river, on the same side, no idea was entertained, by any body, not even by the surveyor, that it would ever touch, much less, that it would cross the river. This is abundantly proved in the cause; for, it appears that even the surveyor, when he discovered, some time after, that it crossed the river, was greatly “ astonished.” It is evident from all these circumstances, that neither Moore nor M’ Clung intetided, by their entries, to cover land on the north side of the river; nor did they intend that their survey should cross the river and take lands on the north side. And although the closing line of the survey does in fact, according to its *507 course, cross the river and embrace the land in controversy, yet the failure actually to run and to mark that Une, (as it was their duty, according to law, to do) prevented a discovery of the fact, that the course of the line would lead them across the river, and thus left all others in the just and reasonable belief that the lands, on the north side of the river, were open to any adventurer. It was after the survey of Moore and M’ Clung, was thus made, and under these circumstances, that Hughes made his location on the land in controversy; and some time after he had made the location, he was encouraged by a message from M’Clung, not only to go on and perfect his title, but to lay out his money in improving the land, establishing a ferry, building houses, &c. which, as M’Clung said, would accommodate travellers, and promote emigration; and thus encourage the settlement, and increase the value of the neighbouring lands; much, if not, most of which belonged to M’Clung. Under such circumstances, I think it was actual fraud in M’Clung, to attempt to avail himself of his legal title for defeating the rights of Hughes; especially if Hughes has lost the opportunity of vesting his money advantageously in other vacant lands, which is probably the fact. And this fraud requires that his patent should he vacated.
This view of the subject renders it unnecessary to en-quire whether Hughes has shewn an excuse for not having filed a caveat. But, if it were necessary that he should do so, 1 am clearly of opinion that he has shewn a sufficient one.
In speaking of the excuse for not filing a caveat, the Judges, in the case of Noland v. Cromwell, say that the party must shew that he, was prevented by fraud, or accident. The real question in Noland v. Cromwell, was, whether the party should be allowed to go into a Court of Equity, without an excuse; not what was a sufficient excuse. The words fraud and accident, were, therefore, used only as examples, and not as being the only grounds *508 of excuse. I am clearly of opinion, that mistake would be as just a ground of excuse, as the two circumstances that were mentioned as examples.
In this case, the mistake under which Hughes laboured, that the lands in controversy were not embraced by the survey of Moore and M’Clung, a mistake produced by the acts and improper omissions of M’ Clung, (viz: the calls of the entries and of the survey for the south side of the river only, the omission to run and to mark the closing line, and above all, the message of M’Clung to Hughes,) sufficiently accounts for his failure to file a caveat. How should it be required of him to file a caveat to prevent Moore and M'Clung from getting a patent for his land, when Moore and M’ Clung, themselves, neither knew, expected, nor intended, that their patent would or should touch his land ? To this might be added the information received by Hughes from Welch, the surveyor who made the survey. I put out of view the fact of Welch being interested in the survey, and regard him only as surveyor. He was applied to by Hughes for a copy of the courses of the survey, for the purpose of ascertaining whether the survey embraced his entry, in order that if it did, he might withdraw his entry, lift his warrant and locate it elsewhere; which he might, very probably, have done advantageously, at that time. Welch sent him word that he would not take his money by unnecessarily copying the courses; for, that the survey did not cross the river. Now, although I do not rely on this declaration of Welch as fixing fraud on Moore and M’Clung, yet I do rely on it as shewing that Hughes laboured under such a mistake as ought to excuse him for not having filed a caveat. When neither the calls of the entries, nor of the survey, were calculated to excite the least suspicion that the survey had crossed the river, the direct and positive information of the surveyor, that the survey did not cross the river to that side on which the lands in controversy lie, affords a sufficient excuse, on the ground of mistake, for failing to file a caveat. I will *509 go farther and say, that if there had been no message from M’Clung ov Welch, to Hughes; if there had been nothing but the entries and the survey, even they are so expressed as to be calculated to produce a belief that they would not touch any land on the north side of the river; and this would have been a sufficient excuse for not filing a caveat. When the description which the party himself makes in the entry, and the description which a sworn officer makes in the survey, leads necessarily to the belief that the land lies on the south side of a river, there is no obligation on a party wishing to locate lands on the north side, to trace the lines actually run, for the purpose of satisfying himself that they do not take in lands on the north side; and much less wmuld there be an obligation on him to be at the expense of employing a surveyor to run lines mentioned in a survey, but neither actually run nor marked,
I am for affirming the decree.

 The Pbesxdest absent.

 See tlie next ease.